```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X
                                   :
UNITED STATES OF AMERICA           :
                                   :
        - v.-                      :
                                   :   08 Cr. 644 (JGK)
LETHEM DUNCAN,                     :
                                   :
            Defendant.             :
                                   :
                                   :
- - - - - - - - - - - - - - - - - X
```

**GOVERNMENT'S SENTENCING MEMORANDUM
PURSUANT TO U.S.S.G. § 5K1.1**

```
                            PREET BHARARA
                            United States Attorney for the
                            Southern District of New York
                            Attorney for the United States
                              of America
```

```
WILLIAM J. HARRINGTON
DANIEL L. STEIN
Assistant United States Attorneys
Southern District of New York

      - Of Counsel -
```

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X
                                   :
UNITED STATES OF AMERICA           :
                                   :
         - v.-                     :
                                   :   08 Cr. 644 (JGK)
LETHEM DUNCAN,                     :
                                   :
         Defendant.                :
                                   :
                                   :
- - - - - - - - - - - - - - - - - X
```

GOVERNMENT'S SENTENCING MEMORANDUM
PURSUANT TO U.S.S.G. § 5K1.1

The Government respectfully submits this brief to advise the Court of the pertinent facts concerning the assistance that defendant Lethem Duncan has rendered in the investigation and prosecution of other persons.  In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.[1]

Overview

From in or about 1998 until on or about July 16, 2008,

---

[1] The Government is not moving for a downward departure from the applicable Sentencing Guidelines range at this time, and instead intends to make such a motion at sentencing.

Duncan served as a supervisor within the New York City Administration for Children's Services ("ACS").  In that position, he was responsible for supervising payments to foster care agencies.  As explained in more detail below, between late 2004 and March 2008, Duncan was involved in a set of corrupt relationships with others, both inside and outside of ACS, which permitted him to embezzle large amounts of public money through two distinct schemes.

Duncan's misconduct was partially discovered by auditors with the New York City Department of Investigation ("DOI") in the Spring of 2008.  When confronted, Duncan immediately confessed to DOI investigators and began working with DOI, at the direction of this Office, to build a case against his co-conspirators.

As set forth below, Duncan's cooperation was extensive, substantial and fruitful.  He made dozens of incriminating recordings that led to the indictment of three co-conspirators.  Based on his information, the Government also developed a second case involving three recipients of fraudulent adoptions subsidies.  And Duncan testified at the trial of one co-conspirator, Stay Thompson.  In anticipation of that testimony, Duncan spent weeks on the painstaking process of reviewing the consensual recording, checking the accuracy of transcripts, and preparing to testify.

## Background

ACS is an agency of the New York City government

responsible for providing a variety of government services to children and their families.  Payment Services, a 165-185 person department within ACS's Financial Services Division, processes payments (approximately $2.3 billion annually) for ACS's contracted services and administrative expenditures, including, in particular: (1) payments to non-governmental, not-for-profit foster care agencies which are dedicated to finding foster parents for children and providing child care subsidies to foster parents,[2] and (2) the payment of adoption subsidies[3] to the parents of adopted children.

In late 1997, Lethem Duncan became a supervisor within Payment Services responsible for managing contract payments, which includes payments to foster care agencies.  In 1999 or 2000, Duncan was promoted to the position of Director of Payment Services, which gave him supervisory responsibility for all types of payments made by ACS (other than administrative payments), including adoption subsidies.

When DOI confronted Duncan in March 2008, the Government was aware of only a single criminal scheme involving the

---

[2] According to Duncan, New York City currently makes monthly payments to foster care agencies of approximately $42 million.

[3] An adoption subsidy is a monthly payment mandated by law to be made for the care, maintenance, and/or medical needs of a qualifying adopted child.  In the event that an eligible parent does not receive the mandated subsidy for a period of time, for example, because of a dispute with ACS that is resolved in the parents' favor, ACS may make retroactive payments to the parent for the period in question.

embezzlement of $375,000 from ACS by Duncan and two co-conspritors, Stay Thompson and Philbert Gorrick. Duncan disclosed the existence of two additional crimes - his solicitation and receipt of illegal gratuities from Stay Thompson in about 2004 and the fraudulent theft of adoption subsidies masterminded by another ACS employee, Nigel Osarenkhoe. Because of the information Duncan disclosed, and his active participation in a proactive investigation, Duncan and six other persons were charged and convicted with felony crimes related to these schemes.

### Duncan's Criminal Conduct

In the course of his work as Director of Payment Services at ACS, Duncan came to know a woman named Stay Thompson. Thompson was the Fiscal Officer for a non-profit, foster care agency called Concord Family Services ("Concord"), until her arrest after this investigation. According to Duncan, Thompson frequently requested his assistance expediting the processing of payments for Concord. As a result, Duncan came to have regular contact with Thompson.

A. The Illegal Gratuities

At some point in 2004, during a lunch meeting with Thompson, Duncan mentioned that he was "short on cash." Thompson offered to help Duncan, and handed him $500 in cash, which he accepted. From that point until approximately June 2005, Duncan admits that he met with Thompson on approximately 10 to 15 occasions and received from Thompson an aggregate amount of

4

approximately seven to eight thousand dollars.

### B. The Embezzlement Conspiracy

In June 2005, Thompson contacted Duncan and reported that Concord was about to be audited.  Thompson told Duncan that she was concerned the auditors would discover the payments she had made to Duncan, and asked Duncan to repay the money.  Thompson initially told Duncan that she had given him $13,000 (an amount that Duncan perceived to be inflated), but later told him the amount was $26,000.  Duncan told her that he could not repay that amount of money.  Thompson and Duncan then came up with the idea of simply embezzling money from ACS, at least in part, to cover the payments Thompson had already made to Duncan.  To embezzle the money, Thompson suggested that Duncan prepare a voucher authorizing a payment to Contemporary Technologies, an information technology consulting firm that had done work for Concord in the past, which was owned and operated by Philbert Gorrick.

In an effort to execute the planned embezzlement, Thompson introduced Duncan to Philbert Gorrick at a meeting in New York, New York.  Gorrick was Thompson's childhood friend.  At their first meeting, Thompson, Gorrick and Duncan agreed that Duncan would cause ACS to issue a check in the amount of $375,000 to Gorrick's company, Contemporary Technologies.

Duncan subsequently caused a check in that amount to be issued by ACS to Contemporary Technologies. Duncan was able to

arrange for the check to be issued by initiating the payment in ACS's computer systems even without any supporting documentation, and then instructing two subordinates to approve the payment. According to Duncan, Gorrick never provided any services or products to ACS or Concord in connection with this payment. After receiving the $375,000 payment, Gorrick split the proceeds with Thompson and Duncan.

    C.    <u>The Adoption Subsidy Scheme</u>

After they embezzled the $375,000 payment from ACS, Duncan and Thompson agreed to steal additional monies from ACS by having Thompson pose as an adoptive mother for non-existent children.

This scheme involved another long-time ACS employee, Nigel Osarenkhoe. Osarenkhoe had been an employee of New York City starting in or about 1993 and began working at ACS in or about 1996. At the time of his arrest in July 2008, Osarenkhoe served in the sensitive position of Supervisor of Adoptions within ACS's Payment Services Department. In that capacity, Osarenkhoe had responsibility for financial reporting of adoption subsidy payments. He had access to and knowledge of the ACS computer systems involved in the processing of adoption subsidy payments. He also reported to Duncan.

Sometime in 2005, Osarenhkoe told Duncan that he had learned a way to make New York City issue adoption subsidy checks

to anyone Osarenkhoe wanted.  Duncan subsequently invited Stay Thompson to serve as a person who could receive fraudulent checks, and gave Osarenkhoe her name.  Between June 2005 and July 2008, Osarenkhoe caused the City of New York to send $148,667.03 in adoption subsidy payments to Thompson.  Those payments were split three ways between Thompson, Duncan and Osarenkhoe

### Duncan's Cooperation

On March 17, 2008, DOI investigators confronted Duncan with financial records showing that (1) Gorrick's company, Contemporary Technologies, had received the ACS check for $375,000 without any invoices or documentation supporting the transaction and (2) Gorrick subsequently paid Duncan tens of thousands of dollars.  At the March 17, 2008 interview, Duncan confessed to DOI investigators that in 2005, he arranged for Gorrick to be paid $375,000 by ACS for fictitious computer services. Gorrick, Thompson, and Duncan then shared the stolen money.  Duncan told DOI officials that, as of March 2008, Gorrick, Thompson and Duncan had discussed plans for a second fraudulent payment for fictitious services.

Duncan also disclosed the existence of the illlegal gratuities and the adoption subsidy scheme.  Prior to Duncan's confession, DOI was unaware of either of these crimes.  Duncan admitted that he, Thompson and Osarenkhoe had stolen adoption subsidy payments when in fact they had not adopted any children

from New York City's Foster Care Program and were not entitled to the monies.  The three co-conspirators shared the stolen funds.

After his confession on March 17, 2008, Duncan immediately agreed to cooperate with DOI to develop additional evidence against Osarenkhoe, Gorrick and Thompson. At DOI's direction, Duncan had numerous consensually recorded telephone calls and meetings with his co-conspirators relating to both of their ongoing criminal schemes.  Duncan did all of this even though we was suffering from severe physical illnesses that, among other things, required surgery and an extended leave of absence from work during his period of cooperation.

    1.    Duncan's Active Cooperation On The
        <u>Adoption Subsidy Scheme</u>

With respect to the adoption subsidy scheme, Duncan had multiple recorded conversations with Thompson and Osarenkhoe about sending yet another adoption subsidy payment to Thompson.  A payment was sent, received by the Thompson, and deposited in her account just prior to her July 2008 arrest.  At the time of her arrest on July 15, 2008, Thompson was carrying the stub for the final check.  The following morning, Duncan delivered a cash kickback to Nigel Osarenkhoe for arranging the July adoption subsidy check for Thompson.  Osarenkhoe was arrested immediately

after that meeting.

### 2. Duncan's Active Cooperation On The Embezzlement Scheme

Similarly, with respect to the embezzlement scheme, Duncan had multiple recorded meetings and telephone calls with Thompson and Gorrick, including meetings on March 24, 2008, April 8, 2008, April 28, 2008, and July 15, 2008. During the meetings, Duncan's co-conspirators openly discussed the false invoice that Gorrick would prepare in order to embezzle more than $700,000 from ACS. They also discussed the agreement that the proceeds would be divided between Gorrick, Thompson and Duncan. On July 15, 2008, Duncan met with Gorrick and Thompson at a restaurant in New York, New York. During the meeting, Duncan provided Gorrick with an ACS check for $711,420.25. During the meeting Gorrick, Thompson and Duncan discussed how Duncan knew that ACS would not detect the crime and how to split the funds. At one point, Thompson expressed her concern that this not "come back to haunt" her.

### 3. Prosecutions Resulting From Duncan's Cooperation

As a result of Duncan's cooperation, 6 people were arrested and charged in connection with these schemes in two separate indictments. This included another high-level official at ACS, Nigel Osarenkhoe, who was abusing his position to steal city monies and the senior fiscal officer, Stay Thompson, at a New York City foster care agency.

A.   Indictment 08 Cr. 1000 (BSJ).

On October 16, 2008, an Indictment was filed charging three counts in connection with the schemes described above. Count One charged Thompson and Osarenkhoe with conspiring to commit mail fraud in violation of 18 U.S.C. § 1349 by fraudulently obtaining adoption subsidy payments.  Count Two charged Thompson and Gorrick with conspiring to embezzle monies from an agency receiving federal funds in violation of 18 U.S.C. § 371. Count Three charged Stay Thompson with engaging in a financial transaction involving funds obtained from the mail fraud conspiracy charged in Count One in violation of 18 U.S.C. § 1957.

Osarenkhoe pled guilty on January 20, 2009, to Count One of the Indictment.  Osarenkhoe did not participate in the conspiracy with Duncan, Thompson and Gorrick to embezzle over $1 million from ACS.  He did, however, send fraudulent checks to other recipients, with a total loss amount of $563,782.34.  The Honorable Barbara S. Jones, United States District Judge, sentenced Osarenkhoe on December 7, 2009, principally to a term of 33 months' imprisonment.

Gorrick pled guilty to Count Two of the Indictment on February 11, 2009.  Judge Jones sentenced Gorrick on July 29, 2009, principally to a term of 33 months' imprisonment.

On or about August 12, 2009, Thompson was convicted after a 6-day jury trial of Counts One and Three of the Indictment.  The

jury could not reach a verdict on Count Two, and a mistrial was declared as to that count. On or about June 4, 2010, Judge Jones sentenced Thompson principally to a total term of 51 months' incarceration.

        B.   <u>Indictment 09 Cr. 125 (WHP)</u>.

After further investigation based on Duncan's disclosure of the adoption subsidy scheme, DOI learned that Osarenkhoe had caused over $550,000 in fraudulent payments to Thompson and at least three other persons - Brenda Towe, Tammy Moore, and Oletha Rhodes. On or about February 10, 2009, an Indictment was filed charging Towe, Moore and Rhodes with conspiring to commit mail fraud in violation of Title 18, United States Code, Section 1349.

Rhodes pled guilty on or about July 31, 2009, to a one-count superseding information that charged her with a substantive mail fraud count in violation of Title 18, United States Code, Section 1341. On or about March 27, 2010, the Honorable William H. Pauley III sentenced Rhodes principally to a term of 3 years' probation with a special condition of 200 hours' community service.

Moore pled guilty on or about July 20, 2009 to Count One of the Indictment. On or about March 27, 2010, Jude Pauley sentenced Moore principally to a term of 5 years' probation with a special condition of 400 hours' community service.

Towe pled guilty on or about August 6, 2009 to Count One of the Indictment. On or about March 27, 2010, Judge Pauley

sentenced Towe principally to a term of 3 years' probation with a special condition of 200 hours' community service.

### Section 5K1.1 Factors

Section 5K1.1 of the Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance. See U.S.S.G. § 5K1.1(a). The application of each of those factors to Duncan's cooperation is set forth below.

1. <u>"[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1))</u>. Duncan's cooperation was absolutely central to the prosecution and conviction of Thompson, Gorrick and Osarenkhoe. Further, without Duncan's confession, the Government would not have learned about Osarenkhoe's fraud in connection with adoption subsidy payments, and would never have learned of the criminal acts by Towe, Moore and Rhodes.

2. <u>"[T]ruthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2))</u>. The Government has no reason to doubt that Duncan's information was truthful, complete, and reliable. It was fully corroborated by financial records and the statements of other participants.

3. <u>"[N]ature and extent" of assistance (§ 5K1.1(a)(3))</u>. By any measure, Duncan cooperation was extensive and significant. After immediately confessing, Duncan agreed to

12

work pro-actively with DOI.  He made dozens of recordings over the course of many weeks, and he did so at a time when he suffered through significant physical pain because of illness.  Duncan also testified, at length, during the trial of Stay Thompson.  The Government relied on his testimony both at the trial, where the jury was persuaded of Thompson's guilt in connection with the adoption subsidy scheme, and at sentencing, where Judge Jones concluded that Thompson was responsible for both the adoption subsidy and embezzlement schemes.

4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§ 5K1.1(a)(4)).  The Government is not aware of any injury or danger that Duncan suffered as a result of his cooperation.

5. "[T]imeliness" of assistance (§ 5K1.1(a)(5)). Duncan began cooperating immediately after he was confronted by DOI with evidence of his crime.  Because of his immediate cooperation, the Government was able to deploy Duncan in a pro-active manner and build successful cases against his co-conspirators.

## Conclusion

In light of the facts set forth above, and assuming that Lethem Duncan continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to request at sentencing, pursuant to Section 5K1.1 of the Sentencing

Guidelines, that the Court sentence Duncan in light of the factors set forth in Section 5K1.1 of the Guidelines.

Dated:    New York, NY
          January 7, 2011